UNITED STATES DISTRICT COURT
FOR WESTERN DISTRICT OF MICHIGAN

IN THE MATTER OF THE SEARCH OF
INFORMATION ASSOCIATED WITH
THE CELLULAR TELEPHONE
ASSIGNED CALL NUMBER (404) 988-
1044, THAT IS STORED AT PREMISES
CONTROLLED BY T-MOBILE

Case No. 1:22-mj-114

**AFFIDAVIT IN SUPPORT OF
AN APPLICATION FOR A SEARCH WARRANT**

I, Benjamin Glynn, being first duly sworn, hereby depose and state as follows:

## I.    INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A) for information about the historic location of the cellular telephone assigned call number (404) 988-1044 (**Subject Phone 1**), as further described herein and in Attachment A, and the location information to be seized is described herein and in Attachment B, and is stored at premises controlled by T-Mobile, a wireless telephone service provider headquartered at 4 Sylvan Way in Parsippany, NJ.

2.      The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. § 2703(c)(1)(A) to require T-Mobile to disclose to the government copies of the information further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-

1

authorized persons will review the information to locate items described in Section II of Attachment B.

3.     I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been since January 2017. During my time as an agent, I have conducted multiple investigations involving the use of cell phone technology to acquire evidence of criminal activity and track criminal subjects' movements as they commit criminal activity. Prior to my employment with the FBI, I was a police officer/investigator with the Rock Hill Police Department in Rock Hill, SC, for six years. I also used cell phone technology to aid in investigations throughout my time with the Rock Hill Police Department

4.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

5.     Based on the information set forth below, there is probable cause to believe that violations of federal law, specifically, wire fraud and conspiracy to commit wire fraud in violation of 18 U.S.C. §§ 1343 and 1349, and interstate transportation of stolen goods in violation of 18 U.S.C. §§ 2314, have been committed by Adarius FERGUSON, Elisha VARY, Chris CAMPBELL, Tipton Lamar WALKER, Marquis DAVIS, Jaylen SULTON, Joshawn WILSON, and others known and unknown. There is also probable cause to believe that the location information described in Attachment B will constitute evidence of these criminal violations.

6.     The court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated, *see* 18 U.S.C. § 2711(3)(A)(i).

## II.     PROBABLE CAUSE

7.     Since approximately January 2019, FBI Special Agents with the St. Joseph Resident Agency in the Detroit Division, as well as law enforcement officers and Walmart investigators in multiple jurisdictions throughout the country, have been investigating a group of subjects who conducted organized, interstate retail fraud and wire fraud against Walmart, with total losses exceeding $300,000.

8.     The coconspirators in this fraud scheme used Walmart store receipts for legitimately purchased goods to return stolen goods that corresponded with items on the valid receipts.

9.     The ringleader of the group is Adarius FERGUSON, who is a resident of Benton Harbor, Michigan. FERGUSON's coconspirators, each of whom was involved in the fraud at various times since January 2019, include Tipton Lamar WALKER, Jaylen SULTON, Elisha VARY, Christopher CAMPBELL, Marquis DAVIS, Joshawn WILSON, and others known and unknown.

10.     On May 4, 2021, a grand jury returned an Indictment charging FERGUSON, CAMPBELL, WILSON, WALKER, SULTON, DAVIS, and VARY with multiple counts, including conspiracy to commit interstate transportation of and possession of stolen goods, conspiracy to commit wire fraud, possession of stolen goods after interstate transport, and wire fraud.

3

11.     Defendants CAMPBELL, WILSON, WALKER, SULTON, DAVIS, and VARY entered guilty pleas and were sentenced.

12.     Defendant FERGUSON has been in the custody of the United States Marshal Service since his arrest on May 5, 2021.

**A.     Mechanics of the Fraud Scheme**

13.     The FBI's investigation has shown that the fraud scheme generally worked as follows:

    a.     Fraudsters identified specific high-priced items to steal from Walmart stores, such as electronic vacuum cleaners, electronic routers, Beats headphones, and Apple products.

    b.     Fraudsters went to Walmart stores and stole or shoplifted large quantities of the high-priced items.

    c.     Fraudsters used cash at other Walmart stores to purchase the same, high-priced items matching the stolen items, generating "legitimate" receipts.

    d.     Shortly after the legitimate purchases of items, Fraudsters switched out some, or all, of the purchased items for previously stolen items and used the "legitimate" receipts to return stolen items. Although the returns were initially flagged—because the serial numbers for some stolen items did not match the serial numbers for some products on the receipt—service desk personnel often overrode the initial system flagging and manually processed the return. After the return was processed, fraudsters either requested to get the receipt back, or were given back the receipt.

e.      Fraudsters then scratched or marked the bar code—"Transaction Code" in Walmart terminology—on the bottom of the receipt, or partly tore it off, so the bar code and Transaction Code number were no longer readable. If the bar code of a Walmart receipt is unreadable, it cannot be scanned into Walmart's computer system and, as a result, a Walmart employee cannot tell from the receipt whether it was previously used to return a listed item. Below is a photograph of an actual receipt used in this scheme that was marked to make the Transaction Code unreadable.



f.      Fraudsters used the "legitimate" receipts with now-defunct bar codes to return stolen and/or purchased items to Walmart stores, resulting in cash refunds for the price of the product(s), plus taxes. The secondary use of these altered receipts was all fraudulent, either through the return of stolen property or through returning legitimately purchased items for which the fraudsters had already received full refunds during the original return.

g.     Fraudsters traveled to multiple Walmart stores, in numerous geographic areas and states, to steal high volumes of the high-priced items so they could get significant quantities of cash in return through the methods described above.

h.     Each time Walmart manually processed a return by entering some or all of the Transaction Code numbers that were visible on a receipt, wires were transmitted from the Point of Sale register in the store processing the return to one of Walmart's servers that are located in the states of Texas, California, Washington, Missouri, Colorado, or Arkansas.

14.     In conjunction with Walmart investigators, the FBI has identified over 70 thefts and over 140 fraudulent return incidents in over 20 states that have occurred since January 2019 involving one or more of the coconspirators identified above. Adarius FERGUSON participated in the overwhelming majority of these incidents.

15.     On numerous occasions, the activity of this group of coconspirators has attracted the attention of local law enforcement and the individuals have been identified and/or arrested while committing the thefts or the fraudulent returns. For example, FERGUSON has been charged at least seven times with retail theft-related offenses for thefts from Walmart in at least five states including Michigan, Wisconsin, Pennsylvania, Virginia, and Tennessee.

6

**B.**      **April 18, 2020 Traffic Stop in Benton Harbor, Michigan, and Recovery of $25,000 in Electronics**

16.      On April 18, 2020, in Benton Harbor, Michigan, Troopers with the Michigan State Police ("MSP") conducted a traffic stop of a white Buick Enclave bearing Florida license plate GWJK08, for making four consecutive turns without signaling. The traffic stop occurred after the vehicle pulled into the driveway of a residence at 534 Britain. The driver of the vehicle, subsequently identified as Ricardo Melhado, of Columbus, Ohio, attempted to get out of the vehicle after it was stopped. Tpr. Garry Guild ordered Melhado to sit back down in the vehicle. Tpr. Guild asked Melhado for his driver's license; Melhado said that he didn't have it on him. Melhado began to verbally escalate the encounter and the front passenger of the vehicle, Christopher CAMPBELL, yelled at Melhado to chill out. Tpr. Guild shined his flashlight into the vehicle and observed numerous, seemingly brand-new electronic items inside, in their original packages. At the time, law enforcement estimated there was over $10,000 worth of new electronics in the white Buick Enclave.

17.      Tpr. Guild asked CAMPBELL about the electronic items in the car. CAMPBELL replied that he knew nothing about them and indicated that they belonged to his uncle, Adarius FERGUSON. CAMPBELL said that FERGUSON was on the phone with CAMPBELL at that time and FERGUSON requested to talk to Tpr. Guild, who agreed. Tpr. Guild then used CAMPBELL's cell phone to talk with a man who identified himself as Adarius FERGUSON. During their phone conversation, FERGUSON said that Tpr. Guild was asking too many questions.

7

FERGUSON said he would come to the traffic stop and provide receipts to law enforcement to demonstrate his rightful ownership of the electronics.

18.     A short time later, FERGUSON arrived at the location of the traffic stop driving a white Yukon Denali with Utah plates. FERGUSON got out of the Yukon Denali and presented rental paperwork for both the Yukon Denali and the white Buick Enclave, reflecting that FERGUSON rented both vehicles. There were no additional drivers on the rental agreement for the white Buick Enclave, which was driven by Melhado at the time of the traffic stop.

19.     FERGUSON told Tpr. Guild that he was a businessman who purchased merchandise in other states and resold it at a profit. FERGUSON provided three receipts from Walmart stores in Missouri, for purchases of electronics. Each receipt showed purchases of electronics totaling just under $2,600 per receipt. When asked why FERGUSON did not purchase electronics locally, FERGUSON replied that he did not like the local Walmart store. Tpr. Guild requested to search the vehicle. FERGUSON stated that he did not want it searched if the stop was turning into a criminal investigation.

20.     While Tpr. Guild was talking to FERGUSON, a male who was with FERGUSON identified himself to Tpr. Guild as Tipton WALKER, subsequently identified by law enforcement as Tipton Lamar WALKER. WALKER told Tpr. Guild that he remembered Tpr. Guild from a stop several years prior. Investigators have confirmed through the Michigan State Police that WALKER was stopped by Tpr. Guild in March 2017 in relation to a stolen dirt bike investigation.

21.    Also during the stop on April 18, 2020, CAMPBELL grabbed a black bag with red piping from the vehicle. FERGUSON said that the bag was his and that it contained over 40 Apple products. CAMPBELL attempted to leave the traffic stop after removing three keys from the seat pocket behind the front passenger seat. The keys were for anti-theft devices, like those used by retail stores to lock electronics and/or electronics cases. A law enforcement officer instructed CAMPBELL to put the keys back in the pocket of the car seat.

22.    Based on the totality of the circumstances, law enforcement believed that the vehicle contained stolen merchandise. Pursuant to the automobile exception, officers began to search the vehicle at the scene. On the front passenger floor of the vehicle there was an Iowa license plate bearing the number IXA665. Under the front passenger seat there was a pair of black and red wire cutters. On the floor behind the driver's seat there was a screwdriver with a green handle. The electronic merchandise in the vehicle was primarily contained in 4 large Rubbermaid-type totes.

23.    Law enforcement recovered from the white Buick Enclave approximately $25,000.00 in retail merchandise that appeared to be stolen from Walmart stores, including 47 Apple Airpods, 2 Apple iPods, multiple electronic routers, modems, Sony DVD/Blu-Ray players, i-Robot/Roomba and Shark electronic vacuums, and Garmin GPS units. Several of the items still contained Walmart shipping labels, reflecting which Walmart stores those items had been shipped to for inventory and sale to customers. The picture below shows all of the electronics items

that were recovered from the white Buick Enclave on April 18, 2020, in Benton Harbor, Michigan.



### C. Electronics Recovered from April 18, 2020 Traffic Stop in Benton Harbor, Michigan Connected to Walmart Thefts in Three States

24.    Using Walmart shipping labels that remained on some of the items recovered from the Buick Enclave on April 18, 2020, Walmart Investigator Ed Henkel was able to identify specific Walmart stores where those products had been in inventory.[1] For example, the shipping label below is one from one of the Sony DVD/Blue-Ray players recovered from the white Buick Enclave. It shows a Walmart

---

[1] According to Investigator Henkel, not all individual Walmart products bear a shipping label because many items ship in case quantities, with a label on the case as opposed to labels on individual product packages within the case. Items that do contain shipping labels are often higher-priced items, but not all high-priced items bear shipping labels.

store number where the item was shipped, in the center of the bottom row of data (circled): store #516, which, according to Inv. Henkel, is in Gun Barrel City, Texas.



25.    Inv. Henkel confirmed corresponding thefts from three Walmart stores matching the shipping stickers on numerous products that were recovered from the white Buick Enclave. The Walmart store thefts included the following:

### D.    March 31, 2020 – Theft at Walmart Store #5747, Locust, North Carolina

26.    As recorded on the store's video surveillance, on March 31, 2020, at approximately 8:23 p.m., two male subjects stole approximately $2,771 worth of merchandise from Walmart store #5747, in Locust, North Carolina. The stolen items included Netgear routers, a JBL speaker, Roku projectors, and a Sony DVD/Blu-Ray player. The store surveillance video shows that, on March 31, 2020, a white Buick Enclave SUV pulled into the store parking lot and parked in the fourth row. This Buick Enclave was an apparent match to the 2020 white Buick Enclave bearing SC license plate QKN951 rented by FERGUSON at that time. Two black men got out of the white Enclave and went into the store at approximately 8:15 p.m., through the

grocery doors. They each got a shopping cart and walked back to the electronics department. Both men proceeded to pick up numerous electronics items and put them in their respective carts. The items included Netgear routers, Roku projectors, Sony DVD/Blu-Ray players, Orbit wi-fi systems, and a JBL speaker. The two men then pushed their carts to the hardware department of the store and entered a back room of the Walmart, where there was an exterior fire door. The two men exited the store through the fire door, undetected by Walmart store employees. The white Buick Enclave was parked outside the fire door. The two men loaded the stolen merchandise (except for one Orbit wi-fi system) into the white Buick Enclave, driven by a third man. The original two men then got in the vehicle, and the third man drove away from the premises. The store surveillance video also showed that a red GMC Yukon arrived around the same time as the white Buick Enclave. Two men from the red GMC Yukon went into the store and engaged with Walmart store associates who were near the electronics area while the thefts were occurring, seemingly distracting the associates while their co-conspirators were stealing electronics.

27.    Investigators have reviewed excerpts of the video surveillance from the March 31, 2020 theft of electronics from Walmart store #5747 in Locust, North Carolina. Based on a review of dozens of surveillance videos and surveillance photographs from Walmart stores as part of this investigation, investigators recognize Christopher CAMPBELL and Jaylen SULTON as the two men who got out of the white Buick Enclave, went into Walmart, and stole merchandise from the electronics department. Investigators recognize Joshawn WILSON as the driver of

12

the Enclave. Investigators also recognize Adarius FERGUSON and Tipton Lamar WALKER as the two men who served as lookouts during the theft. While in the store, FERGUSON was captured on surveillance using a cell phone. Below are still images taken from the surveillance footage depicting SULTON, CAMPBELL, FERGUSON and WALKER at the Locust Walmart:

   

**SULTON**          **CAMPBELL**          **FERGUSON**          **WALKER**

Below is a still image of the Enclave and the driver, Joshawn WILSON:



28.      Earlier in the day, at approximately 11:00 a.m., WILSON was captured on surveillance wearing the same jacket as he is wearing above while committing a theft with CAMPBELL at Walmart store #2783 in Lexington, Kentucky:

13



**WILSON          CAMPBELL**

29.     Also, WILSON was stopped for speeding by Missouri State Highway Patrol on April 15, 2020 in Andrew County, Missouri. Wilson was driving the white 2020 Buick Enclave bearing Florida license plate GWJK08, which was rented by FERGUSON and involved in the Benton Harbor, MI traffic stop on April 18, 2020. FERGUSON's group was involved with multiple purchases and subsequent refunds in both Missouri and Kansas on April 14 and 15, 2020.

30.     Several of the items recovered from the white Buick Enclave in Michigan on April 18, 2020, which did not have Walmart shipping labels, matched items stolen from Walmart store #5747 on March 31, 2020. Those items included Netgear routers, a JBL speaker, and an Orbi wi-fi system. Additionally, one of the Sony DVD/Blu-Ray players recovered from the white Buick Enclave on April 18, 2020, pictured below, matches the Sony DVD/Blu-Ray player stolen from Walmart store #5747 on March 31, 2020, and bears a shipping sticker reflecting that it was shipped to store #5747 for inventory and sale.



### E.    April 10, 2020 – Theft at Walmart Store #516, Gun Barrel City, TX

31.    As recorded on the store's video surveillance, on April 10, 2020, at approximately 8:22 a.m., two male subjects stole approximately $5,068 worth of merchandise from Walmart store #516, in Gun Barrel City, Texas. The stolen items included Sony PlayStation gaming systems, Sony DVD/Blu-Ray players, Garmin GPS devices, and electronic routers. The store surveillance video shows that, at approximately 8:01 a.m., a white SUV pulled into the parking lot of store #516. Two men got out of the backseat doors of the SUV and went inside the front, general merchandise door of the store. Once inside, one man, Subject A, grabbed a shopping cart. The two men took separate routes back to the electronics department of the store, where Subject A placed some items in his cart including a JBL speaker, Powerbeats headphones, and routers. At approximately 8:10 a.m., the two men met in the video game aisle. Subject A appeared to serve as a lookout while the other, Subject B, used a key to open a security cage containing PlayStation items. Once the

cage was unlocked, the men switched places/roles, with Subject B serving as the lookout. Subject A walked to the security cage, removed eight PlayStation gaming systems, and placed them into his cart. Subject A then removed his jacket and lay it over the PlayStations. Subject A then went to the housewares section of the store while Subject B went to the front of the store to get a shopping cart. In the housewares section, Subject A proceeded to put all the PlayStation gaming systems and electronics items into a large grey tote, which he covered with a lid. Meanwhile, Subject B pushed his cart back to the electronics department, where he placed 10 Sony DVD/Blu-Ray players into his cart. Subject B then walked to the housewares section to meet Subject A. The two men put all the Sony DVD/Blu-Ray players into a second large grey tote with a lid, which they placed in Subject B's cart. The two men pushed their carts to the front of the store, through the self-checkout area, and out the front general merchandise door at approximately 8:22 a.m., without detection by store employees. They returned to the white SUV, put the large totes in through the back-lift gate, got in the vehicle, and drove away.

32.     Investigators have reviewed excerpts of the video surveillance from the April 10, 2020 theft of electronics from Walmart store #516 in Gun Barrel, Texas. Based on a review of dozens of surveillance videos and surveillance photographs from Walmart stores as part of this investigation, investigators recognize CAMPBELL and WILSON as the two men who got out of the white SUV, went into Walmart, and stole merchandise from the electronics department. Below are still images taken from the surveillance footage depicting CAMPBELL and WILSON at the Gun Barrel Walmart:

   

**CAMPBELL**          **WILSON**

33.    Several of the items recovered from the white Buick Enclave in Benton Harbor, Michigan on April 18, 2020, which did not have Walmart shipping labels, matched items stolen from Walmart store #516 on April 10, 2020. Those items included routers, a JBL speaker, and Garmin GPS devices. Additionally, nine of the Sony DVD/Blu-Ray players recovered from the Buick Enclave matched the Sony DVD/Blu-Ray players stolen from Walmart store #516 on April 10, 2020, all with shipping stickers reflecting they were shipped to store #516 for inventory and sale.

**F.    April 17, 2020 – Theft at Walmart Store #1176, Stoughton, Wisconsin**

34.    As recorded on the store's video surveillance, on April 17, 2020, at approximately 7:46 p.m., two males parked a white Buick Enclave at Walmart Store #1176, in Stoughton, Wisconsin. They got out of the vehicle and placed a large Rubbermaid-type tote inside a shopping cart. The two men then entered through the general merchandise doors of the Walmart and walked to the electronics department. One man, Subject A, was wearing a black sweatshirt and tan khakis. The second man, Subject B, was wearing a grey sweatshirt. In the electronics department, Subject B pulled something out of his pocket, presumably a key, and tried to open the

17

headphone case. Over the next several minutes, both subjects went various places in the electronics department. At one point, Subject B is seen on the video removing anti-theft devices from Roku video projectors and a Sony 4K DVD/Blu-Ray player. The subjects proceeded to place electronic items in the large tote that was in their shopping cart. The men then pushed the cart to the front of the store and walked out the general merchandise door, bypassing the checkout lines. The theft was undetected at the time by Walmart store personnel. Subjects A and B stole the following items from Walmart Store #1176, totaling $2,481: Netgear routers, an AC3000 router, one cable modem, a Sony 4K DVD/Blu-Ray player, two Roku video projectors, two Roomba vacuums and two Shark robotic vacuums.

35.     Investigators have reviewed excerpts of the video surveillance from the April 17, 2020 theft of electronics from Walmart store #1176 in Stoughton, Wisconsin. Based on a review of dozens of surveillance videos and surveillance photographs from Walmart as part of this investigation, investigators recognize FERGUSON and CAMPBELL as the two men who got out of the white Buick Enclave, went into Walmart, and stole merchandise from the electronics department. Below are still images taken from the surveillance footage depicting FERGUSON and CAMPBELL at the Stoughton Walmart:

 

**FERGUSON**          **CAMPBELL**

36.     Several of the items recovered from the Buick Enclave in Benton
Harbor, Michigan on April 18, 2020, which did not have Walmart shipping labels,
matched items stolen from Walmart store #1176 on April 17, 2020, including the
Shark and Roomba electronic vacuums and the AC3000 router. Additionally, one of
the Sony DVD/Blue-Ray players recovered from the white Buick Enclave matched the
Sony DVD/Bu-Ray player stolen from Walmart store #1176 on April 17, 2020 and
bore the shipping sticker reflecting that it was shipped to store #1176 for inventory
and sale (below). Likewise, multiple Netgear routers and a modem recovered from
the white Buick enclave bore shipping stickers for store #1176.



37.     In addition to the above information, Investigator Henkel subsequently reviewed every item seized by MSP and conducted database research to locate any history on those items. Through his research, Investigator Henkel identified 93 stolen items with a total retail value of $17,037.72. Investigator Henkel identified 11 items from the traffic stop which had a sales history, indicating they were legally purchased. The total retail value of these 11 items was $1,909. The remaining 48 items, with a total retail value of $7,696.76, were unable to be confirmed by Investigator Henkel as stolen due to the way Walmart registers and tracks serial numbers for certain items. However, those items are still suspected of being stolen based on the totality of the investigation.

### G.     Fraudulent Cycles of Purchases and Duplicate Returns

38.     Despite the intervention by law enforcement with the traffic stop on April 18, 2020, in the spring and summer of 2020, FERGUSON and his coconspirators continued to commit large thefts and fraudulent returns at multiple Walmart locations throughout the United States. Below are selected examples of fraudulent "cycles" of legitimate Walmart purchases followed by immediate returns of stolen goods and subsequent "duplicate" returns using the same receipt again to obtain a second full refund.

#### i.  Fraud Cycle Example 1

*Purchase in Waukegan, IL*
*Return/Refund in Waukegan, IL*
*Duplicate Return/Refund in Kalamazoo, MI*

39.     June 1, 2020, 12:08 p.m. Purchase – Tipton Lamar WALKER and coconspirator David SIMS used cash to purchase $2,577.64 in electronics at Walmart

store 3891 in Waukegan, IL, and were provided a receipt with Transaction Code 6099 4367 0584 1872 9134 35.

40.   <u>June 1, 2020, 12:39 p.m. Return/Refund</u> – WALKER and SIMS conducted a return at Walmart store 3891 in Waukegan, IL, using the receipt with Transaction Code 6099 4367 0584 1872 9134 35. The electronic items returned were the same types and quantities of those reflected on the receipt, but some serial numbers did not match. The store employee conducted a manual override to effectuate a cash return of $2,577.64, reflecting all of the electronic items on the receipt.

41.   <u>June 3, 2020, 1:14 p.m. Duplicate Return/Refund</u> – Coconspirators Adarias FERGUSON and Elisah VARY conducted a return at Walmart store 5065 in Kalamazoo, MI, using the June 1, 2020 receipt from Walmart store 3891 in Waukegan, IL, which was altered slightly to change the second-to-last number from "3" to "6": 6099 4367 0584 1872 9134 65. The electronic items returned matched the types of items reflected on the June 1, 2020 Waukegan receipt. Notably, some serial numbers of the products returned on June 3 in Kalamazoo did match those shown on the Waukegan receipt—but the returns for those items had already been processed and cash refunded at the Waukegan store on June 1, 2020. FERGUSON and VARY were refunded $2,223.04 in cash.

## ii. Fraud Cycle Example 2

*Purchase in Antioch, IL*
*Return/Refund in Antioch, IL*
*Duplicate Return/Refund in Kalamazoo, MI*

42.     June 1, 2020, 4:16 p.m. Purchase – Tipton Lamar WALKER and coconspirator David SIMS used cash to purchase $3,260.12 in electronics at Walmart store 5199 in Antioch, IL, and were provided a receipt with Transaction Code 0221 0526 3741 5862 8473 64. As WALKER was completing the purchase transaction, SIMS took the purchased electronics in bags out of the store to a GMC SUV in the parking lot. Shortly thereafter, SIMS reentered the store with Walmart bags full of electronics and connected with WALKER.

43.     June 1, 2020, 5:17 p.m. Return/Refund – WALKER and SIMS conducted a return at Walmart store 5199 in Antioch, IL, using the receipt with Transaction Code 0221 0526 3741 5862 8473 64. The electronic items returned were the same types and quantities of those reflected on the receipt, but some serial numbers did not match. The store employee conducted a manual override to effectuate a cash return of $3,260.12, reflecting all of the electronic items on the receipt.

44.     June 3, 2020, 1:34 p.m. Duplicate Return/Refund – Coconspirators Adarius FERGUSON, Elisha VARY, and Marquis DAVIS conducted a return at Walmart store 5065 in Kalamazoo, MI, using the June 1, 2020 receipt from Walmart store 5199 in Antioch, IL, which was altered slightly to change the second-to-last number from "6" to "3": 0221 0526 3741 5862 8473 34. The electronic items returned matched the types of items reflected on the June 1, 2020 Antioch, IL receipt. Notably, some serial numbers of the products returned on June 3 in Kalamazoo did match

those shown on the Antioch receipt—but the returns for those items had already been processed and cash refunded at the Antioch store on June 1, 2020. FERGUSON, VARY, DAVIS were refunded $3,294.40 in cash.

### iii.  Fraud Cycle Example 3

*Purchase in Lansing, MI*
*Returns/Refunds in Lansing, MI*
*Duplicate Return/Refund in Harborcreek, PA*

45.  <u>July 17, 2020, 1:19 p.m. Purchase</u> – Coconspirators WALKER and VARY used cash to purchase $2,429.26 in electronics at Walmart store 2869 in Lansing, MI, and were provided a receipt with Transaction Code 7687 3772 3898 2352 2437 31. While WALKER was completing the purchase transaction, VARY took some of the electronics they just purchased out of the store, in Walmart bags, to a Chevrolet Tahoe in the parking lot. A few minutes later, VARY got out of the Tahoe and went back into the Walmart store, carrying a bag of electronics in his left hand. VARY connected with WALKER near the front of the store.

46.  <u>July 17, 2020, 1:32 p.m. Return/Refund</u> – Coconspirators WALKER and VARY conducted two back-to-back returns at Walmart store 2869 in Lansing, MI, using the receipt with Transaction Code 7687 3772 3898 2352 2437 31. VARY was near the service desk, on a cell phone, while WALKER conducted the returns. The electronic items returned were the same types and quantities of those reflected on the receipt, but some serial numbers did not match. The store employee conducted a manual override to effectuate a total cash return of $2,413.56, reflecting all of the electronic items on the receipt.

47.  <u>July 21, 2020, 1:39 p.m. Duplicate Return/Refund</u>: Coconspirators Adarius FERGUSON and Tipton Lamar WALKER conducted a return at Walmart store 3281 in Harborcreek, PA, using the July 17, 2020 receipt from Walmart store 2869 in Lansing, MI, which was altered slightly to change the second-to-last number from "3" to "6": 7687 3772 3898 2352 2437 61. The electronic items returned matched the types of items reflected on the July 17, 2020 Lansing receipt. Notably, some serial numbers of the products returned on July 21 in Harborcreek did match those shown on the Lansing receipt—but the returns for those items had already been processed and cash refunded at the Lansing store on July 17, 2020. FERGUSON and WALKER were refunded $2,086.08 in cash.

48.  <u>Wire Transmissions</u>: All of the refunds described above involved interstate wires via the transmission of electronic signals across state lines. During all refund transactions, electronic signals were transmitted as follows:

Point of Sale (Store register) ⟶

Point of Sale Controller (Store server) ⟶

Walmart Dotcom servers, aka Combined Purchase History (CPH) data center(s), located in Arkansas, California, Colorado, Missouri, Texas, or Washington ⟶

Point of Sale Controller (Store server) ⟶

Point of Sale (Store register).

49.  <u>Fraudulent Nature of Return Transactions</u>: The returns processed in Waukegan, IL, Antioch, IL, and Lansing, MI—all of which followed shortly after purchases of electronics in those respective Walmart stores—were fraudulent because approximately half of the returned merchandise on each occasion was stolen

24

merchandise—not merchandise that the coconspirators had just purchased in those stores. The returns processed in Kalamazoo, MI, and Harborcreek, PA, likewise were fraudulent because approximately half of the returned merchandise on each occasion was stolen merchandise. Additionally, the "duplicate" returns in these locations were fraudulent because the fraudsters used altered receipts to return items for which the fraudsters had already received full refunds during the original return(s).

### H.   Summary of Adarius FERGUSON's Involvement

50.     Adarius FERGUSON was leader of this conspiracy for its duration. To date he has been linked to approximately 300 fraudulent interactions at Walmart stores including purchases, thefts, attempted thefts, refunds, and attempted refunds. FERGUSON has been linked to these incidents through various investigative methods including surveillance footage, previous law enforcement interactions, vehicle rental records, receipt histories, travel patterns and historical cell phone location information. FERGUSON has been involved in fraudulent conduct resulting in over $300,000 in losses to Walmart.

## III.   COCONSPIRATORS' USE OF CELLULAR PHONES

51.     In multiple surveillance images excerpted from Walmart video footage, FERGUSON and his co-conspirators are captured using cell phones while they are either stealing items, fraudulently returning items, or attempting to return items to Walmart. My determination respecting the identities of the individuals on the Walmart video surveillance reflects my review of dozens of Walmart surveillance videos and excerpted surveillance photographs involving these subjects, and my comparison to law enforcement photographs, associated police reports, and my

personal observations of the defendants. The following are just a few examples of many surveillance photos of the subjects using cell phones in conjunction with thefts, fraudulent returns, and attempts at Walmart stores in numerous states:

a. On March 31, 2020, FERGUSON, CAMPBELL, SULTON, and WALKER were captured on Walmart surveillance video in Locust, North Carolina, stealing over $2,700 in electronic merchandise. The surveillance shows FERGUSON using a cell phone while in the store.

b. On April 17, 2020, FERGUSON and CAMPBELL were captured on Walmart surveillance video in Stoughton, Wisconsin, stealing over $2,300 in electronic merchandise. The surveillance shows CAMPBELL using a cell phone while in the store.

c. On April 27, 2020, FERGUSON, CAMPBELL, SULTON, and WILSON were captured on Walmart surveillance video in Lenoir, North Carolina, stealing over $15,000 in electronic merchandise. The surveillance shows FERGUSON and WILSON using cell phones while in the store.

d. On June 3, 2020, FERGUSON, VARY, and DAVIS were captured on Walmart surveillance video in Kalamazoo, Michigan, where they conducted two fraudulent returns for a total of $5,517.44. The surveillance shows FERGUSON, VARY, and DAVIS using cell phones while in the store.

e. On July 17, 2020, FERGUSON and WALKER were captured on Walmart video surveillance in Portage, Michigan, where they attempted a fraudulent

return but were denied by Walmart personnel. WALKER is seen on the video surveillance using a cellular telephone while in the store.

## I.    Attribution of Subject Phone 1 to Adarius FERGUSON

52.    During the traffic stop of the white Buick Enclave on April 18, 2020, in Benton Harbor, Michigan, MSP Tpr. Guild asked FERGUSON for a contact number. FERGUSON provided the number for **Subject Phone 1**, namely (404) 988-1044. On April 20 and 21, 2020, FERGUSON called the MSP Niles Post numerous times, using **Subject Phone 1**, to inquire about getting back the electronic merchandise that was recovered from the white Buick Enclave on April 18, 2020.

53.    On July 17, 2020, FERGUSON used **Subject Phone 1** to call MSP Detective Sergeant Taylor Bonovetz, to inquire about the merchandise.

54.    On March 1, 2021, FERGUSON contacted MSP Tpr. Dorr to inquire into the status of his case and the possibility of receiving the items seized from his vehicle during the traffic stop in Benton Harbor, MI on April 18, 2020. FERGUSON provided **Subject Phone 1** as his current phone and requested Trooper Dorr call him back on **Subject Phone 1**.

55.    A subpoena was issued to T-Mobile seeking subscriber information and call detail records for **Subject Phone 1**. The subpoena response indicated that **Subject Phone 1** has been subscribed to Cierra Nelson, of Benton Harbor, Michigan, since March 2018. Cierra Nelson is the mother of two of Ferguson's children.[2]

---

[2] Cierra Nelson's relationship to FERGUSON has been confirmed by law enforcement through investigation including review of a Facebook profile operated by FERGUSON, in the name of "DePriest" Ferguson. FERGUSON's middle name is DePriest. Additionally, a Confidential Source who has provided reliable information to me in the past knows

27

56.     Based on the foregoing, a search warrant was issued to T-Mobile to gain historical location information for FERGUSON's phone, **Subject Phone 1,** from January 2019 until October 26, 2020. A review of the location information for **Subject Phone 1** confirmed that **Subject Phone 1** was in the same location as the majority of the known thefts, fraudulent returns, and attempted returns at Walmart stores since 2019 involving FERGUSON. Additionally, a review of the call detail records of **Subject Phone 1**, coupled with other investigative means, yielded phone numbers used by FERGUSON'S co-conspirators.

**J.     Spring 2021 Activity in Furtherance of the Fraud Scheme**

57.     According to Walmart Investigator Henkel, on March 16, 2021, there were three incidents at Walmart stores in northern Indiana that matched the modus operandi of FERGUSON and a coconspirator: two theft attempts and one successful theft. The successful theft occurred at a Walmart store in Goshen, Indiana. The subjects stole over $1,600 in electronic items including Blu-Ray players and receivers. I have personally reviewed excerpted photos from the surveillance footage of the Goshen theft and recognize FERGUSON and Jaylen SULTON as the subjects involved.

58.     According to Walmart Investigator Henkel, on March 17, 2021, there was an additional theft at a Walmart store in Round Lake Beach, Illinois, that matched the modus operandi of FERGUSON and his coconspirators. During this

---

FERGUSON personally and explained that Nelson is the mother of two of FERGUSON's children.

theft, two subjects stole DVD players and shark robot vacuums, using security keys to access the locked items. The suspects' vehicle was identified as a tan 2017 Cadillac CT6 bearing Michigan license plate DCA131. The registered owner of that Cadillac is Adarius FERGUSON. I have personally reviewed excerpted photos from the surveillance footage of the Round Lake Beach theft and recognize FERGUSON as one of the involved individuals. FERGUSON conducted the South Bend theft with the same subject as the Goshen, Indiana, theft, who has yet to be identified.

### K.    Search of Subject Phone 1 – Prospective Location Information

59.    On March 18, 2021, an additional search warrant was issued to T-Mobile seeking real-time location data for **Subject Phone 1**. Investigators used that location data to track FERGUSON's movements as he traveled throughout several states and conducted more of the same fraudulent activity at Walmart stores.

60.    On March 28, 2021, using the prospective location information from **Subject Phone 1**, investigators conducted physical and electronic surveillance of FERGUSON as he and Joshawn WILSON arrived back into the Benton Harbor, MI area after the multi-day trip through various states. After dropping WILSON off at a residence in Benton Harbor, FERGUSON eventually began traveling westbound on I-94 westbound away from Benton Harbor. Michigan State Police Trooper Aaron Adams assisted investigators and conducted a traffic stop on a silver 2020 Chrysler Pacifica, driven by FERGUSON, due to a traffic infraction, namely improper lane use. Additionally, investigators had reasonable suspicion to stop FERGUSON's vehicle based on his modus operandi and the recent fraudulent activity at Walmart stores in

other states, corresponding with the location data for **Subject Phone 1**. At the time

of the stop, FERGUSON was traveling westbound on I-94, near exit 16.

61.     Upon approaching the vehicle, Trooper Adams observed a large quantity

of boxed/new Walmart electronic products in the back compartment of the Pacifica.

The presence of new Walmart electronics in the vehicle, coupled with FERGUSON

and WILSON's recent thefts/fraud against Walmart in neighboring states, led law

enforcement to believe that the vehicle contained evidence of their crimes, namely

goods stolen from Walmart stores or purchased from Walmart stores in furtherance

of the scheme, as well as cell phones containing evidence of the fraud scheme, such

as historic location data, files containing images of Walmart receipts, call logs

reflecting communications between coconspirators, and substantive communications

between coconspirators in the form of text messages or SMS communications.

62.     Upon searching the Pacifica, investigators located and seized multiple

relevant pieces of evidence including, but not limited to, numerous Walmart

electronic items, altered Walmart receipts, a Walmart associate vest, a Walmart

Motorola radio (*i.e.*, a radio used by store employees), and Walmart security keys (*i.e.*,

keys to locked electronics cabinets within Walmart stores). Investigators also seized

the cellular device believed to be associated with **Subject Phone 1**.

63.     After the seizure of the device associated with **Subject Phone 1,** a

search warrant was secured to search the device. Upon executing the search warrant,

investigators confirmed **Subject Phone 1** was the number associated with the

device, i.e., the phone used by FERGUSON. Additionally, numerous images of

Walmart receipts were observed in the photograph files of the device. Investigators linked many of these receipt images to previously identified fraud activity at Walmart stores.

64.     Investigators now seek this warrant authorizing them to collect the historical location information regarding **Subject Phone 1** from T-Mobile. Although investigators received the prospective location information for Subject Phone 1 beginning on March 28, 2021, which was provided by T-Mobile in the form of periodic geolocation notifications, the historical location information will more adequately reveal the travel patterns and locations of **Subject Phone 1** between March 18, 2021 and April 1, 2021, a timeframe in which FERGUSON was actively conducting the fraud under investigation as detailed above.

## IV.  TECHNICAL CAPABILITIES OF SPRINT, T-MOBILE, AND VERIZON

65.     In my training and experience, I have learned that T-Mobile is a wireless service provider that provides cellular telephone access to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including cell-site data, also known as "tower/face information" or "cell tower/sector records." Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every

call made to or from that device. Accordingly, cell-site data provides an approximate location of the cellular telephone but is typically less precise than other types of location information, such as E-911 Phase II data or Global Positioning Device ("GPS") data.

66.     Based on my training and experience, I know that T-Mobile can collect cell-site data about **Subject Phone 1**. I also know that wireless providers such as T-Mobile typically collect and retain cell-site data pertaining to cellular phones to which they provide service in their normal course of business in order to use this information for various business-related purposes.

67.     Based on my training and experience, I know that wireless providers such as T-Mobile typically collect and retain information about their subscribers in their normal course of business. This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless telephone service. I also know that wireless providers such as T-Mobile typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular phone and other transactional records, in their normal course of business. In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to confirm FERGUSON's identity as the user of the **Subject Phone 1** and may assist in the identification of co-conspirators who were in contact with **Subject Phone 1** and/or victims.

## V.    AUTHORIZATION REQUEST

68.    Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.

69.    I further request that the Court direct T-Mobile to disclose to the government any information described in Sections I and II of Attachment B that is within its possession, custody, or control. Because the warrant will be served on T-Mobile who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.